## Barnett v. Mutual Insurance Co. of Berks County

Before Aponick, P. J., Lewis and Pinola, JJ.

*J. Earl Langan, David Yelen* and *Sandor Yelen*, for plaintiffs.

*Reynold J. Kosek*, for defendant.

PINOLA, J., March 31, 1958.—Plaintiffs ask for a new trial in an action on a fire insurance policy in which the trial judge directed a verdict for defendant.

The reasons assigned are as follows:

"1. The verdict as directed by the learned Trial Judge was against the evidence.

"2. The verdict as directed by the learned Trial Judge was against the weight of the evidence.

"3. The verdict as directed by the learned Trial Judge was against the law.

**638**

"4. The learned Trial Judge erred in refusing to affirm the plaintiffs points for binding instructions in its charge to the jury."

In their complaint, plaintiffs averred that on or about December 6, 1955, defendant for a valuable consideration delivered a certain insurance policy in the amount of $22,000, insuring their furniture, fixtures and stock while located in a plant situate at 602 West State Street, Larksville.

The policy insures the described property "for the term of one year from October 5th, 1955 . . . to October 5th, 1956."

The basis of the complaint is that the policy "erroneously" recites the term and that "it was within the contemplation of the parties and intended by them that the contract be for a period of one year effective on a subsequent date, namely, December 6, 1955."

The premium was never paid and fire destroyed the property on October 19, 1956, causing a total loss.

In their proof of loss submitted to the company, plaintiffs indicated the following: "Date Issued—Oct. 5, 1955—Countersigned on December 6, 1955," and above "Date Expires," they typed the words "orally renewed." The proof is signed by both plaintiffs and was sworn to by them on November 8, 1956.

### Discussion

On the basis of their complaint, in order to recover it was incumbent upon plaintiffs to reform the policy. This they undertook to do. The trial judge directed a verdict for defendants. At argument of the motions for new trial and for judgment n. o. v., counsel changed their tactics, and insisted that the case should have gone to the jury because of alleged ambiguity.

A party cannot go to trial on one theory, and then, after losing, raise an entirely new and inconsistent theory as a reason for a new trial: Weiskircher v. Connelly, 256 Pa. 387; Friedlander v. Shor, 324 Pa. 483.

In Kramer v. Pittsburgh Coal Company, 341 Pa. 379, Chief Justice Schaffer said on page 382:

"The point could not be raised for the first time in the motion for a new trial." See also Weidner v. Roeper, 25 Dist. R. 876.

There is no question but that plaintiffs tried their case on the basis of reformation of their agreement. In their trial brief they cited in support of their position the decision in The Farmers' Mutual Fire Ins. Co. v. Barr, 94 Pa. 345. In that case the application was for insurance for "the term of three years, beginning at noon of the 3d day of May 1870." On May 6th, the policy was issued, but the premium was not paid until May 31st. The property was destroyed by fire on May 19, 1873. Plaintiff contended that the policy was not to be in effect until the insurance was approved by the directors of the company and the payment of the premium. Therefore, he urged, it was in force at the time of the fire. The company denied liability. Justice Sterret said, on page 350:

"If it was true, as he alleged, that the company agreed to insure his property for three years from May 31st, 1870, he had a right to have the policy reformed, or treated as reformed, so as to correspond with the correct date."

In directing the verdict, the trial judge explained:

"The plaintiffs, under the circumstances, have asked that the written contract, the policy, be reformed to conform to what they say is the understanding that the policy was to be in effect for a year from December 6th, 1955 and not October 5th, 1955. I am of the opinion that the evidence presented by the plaintiffs in that connection does not measure up to the standard required by law, that the plaintiffs have not met the burden imposed upon them under the law. . . ."

No objection was made and no exception taken to that statement. Of course, none could have been made

or taken because that is the theory upon which the case was tried by plaintiffs.

Even under their new theory the case could not have gone to the jury because there is no ambiguity.

In Union Marine and General Ins. Co. v. Holmes, 249 Ala. 294, 31 So. 2d 303, the policy insured a vehicle from February 7, 1943, to February 7, 1944, at 12:01 a.m. The insured sought to recover damages resulting from a collision which took place at 4:45 p.m. on February 7, 1944. The policy contained a stipulation similar to the one in this case, that it should not be vaild "unless" countersigned by the agent, which was not done until February 8.

The court, denying liability, declared on page 298:

". . . it is clear that the delayed countersigning did not extend the period of liability, the limitation of which was stated in the face of the contract. Nor did it inject into the contract an ambiguity as to the period of coverage."

There is, therefore, no merit to plaintiff's new contention.

The case was properly terminated on the basis of the pleadings and issues.

Judge Sterrett pointed out in Rowand v. Finney, 96 Pa. 192, that under our system of jurisprudence principles of equity are recognized and enforced in common law proceedings. In connection with written instruments, he said, on page 196:

"It is only on the ground of fraud, accident or mistake, in the procurement of a written instrument, or fraudulent use of it afterwards, that a chancellor will lend his aid to a party who seeks to avoid the legitimate operation of such instrument; and, while parole evidence is admissible to prove the alleged fraud, accident or mistake, the evidence . . . should always be clear, precise and indubitable. If courts do not strictly enforce the rule, and, at the same time, exercise the

power, with which they are invested in such cases, the security, afforded by deeds and other written instruments, as evidence of title and of business transactions between men, will be most seriously impaired."

At page 198, he added:

"Under our peculiar system of administering equitable principles in common-law actions, the judge presiding at the trial performs the functions of a chancellor, and if his conscience is not moved to grant the equitable relief sought, it is his duty to interpose, either by withdrawing the case from the jury, or by refusing to receive or enter judgment on a verdict that is contrary to equity and good conscience. . . . When the requisite kind or degree of proof is wanting, the better practice is for the court to give the jury binding instructions, and thus withdraw the case from their consideration."

That is exactly what the trial judge did.

From the testimony it appears that on or about October 5, 1955, Gordon Dietterick, agent of defendant, solicited insurance from plaintiffs on their furniture and stock. Mr. Abe Barnett, one of plaintiffs, testified that he was told by Mr. Dietterick that he would have to get a rate determination and an inspection before insurance could be had, and that within the next few days somebody would approach them. He said that a few days later an inspector came to the premises and went through the building. After his inspection, "he told me we would be given a list of certain recommendations that would have to be filled out before the rate determination could be had and before the insurance could be had." He identified an exhibit, a printed form on which appears the following below the recommended corrections:

"In making a survey of the above property on 10/7/55 our inspector has the following recommenda-

tions to make, which we believe are essential to the safety of your property. When these recommendations have been taken care of, kindly sign and return this slip to us for completion of our records. If it is not possible for you to comply with such recommendations, we will appreciate your writing us fully."

Under this statement appears:

"MUTUAL INSURANCE COMPANY OF BERKS COUNTY

"Reading, Pa.                                    Policy #
                     Dietterick, Agent"

He declared that a second such form was received about two weeks after the first and that the recommended changes were made. They signed the slip and returned it about the middle of November.

He did not see the agent again until the policy was delivered in the early part of December, when the agent said he "was finally able to get the insurance."

He testified further that when he received the policy he did not read it, filed it away and that he was under the impression that he had no insurance until the recommendations of the inspector were carried out. He was asked by counsel:

"What impression were you under?"

And he replied:

"That I was not insured because the slip from the inspector with the recommendations carry no policy number and the previous insurance that we had, any previous insurance would be covered by a binder to denote."

Apparently he was under a misapprehension. He knew he was covered by a binder, but he did not know the effect of it, that he was actually insured under it.

He testified that the proof of loss was prepared by one Mr. Yelen, a public adjuster, to whom he gave all the necessary information.

In connection with it, he was asked:

"Q. So that on your own proof of loss and data that you testified was supplied by yourself, you list the date of issue of the policy as October 5th, 1955, is that right?

"A. That is correct, sir.

"Q. Now tell us what it said on the third line 'date expired'?

"A. Orally renewed.

"Q. Orally renewed. So that on your proof of loss you stated that the policy was issued October 5th, 1955 and it was orally renewed at its expiration date, is that right?

"A. That is correct."

He was asked again:

"Q. So you had read the policy and you knew the terms of the policy before you filled out this proof of loss, is that what you are telling me?

"A. That is correct, sir."

Again he testified:

"Q. Now will you please answer my question as to why you put 'orally renewed' on the proof of loss even though you said the policy wasn't issued until December 6th?

"A. I put 'orally renewed' on there because at the time of engaging Mr. Dietterick through Mr. Noterman we were told that he would get insurance for us and he would take care of us, so we took it just like we had prior Flack Agency, there was an automatic renewal."

That is the extent of the testimony on the basis of which plaintiffs sought reformation.

For defendant, Gordon Dietterick, the agent, testified that he placed a binder upon the property after first consulting the home office on October 5, 1955. That he located an inspector in the vicinity on October 7, 1955, who after visiting the premises, made certain

recommendations which were listed in the notice sent to plaintiffs to which we have referred above.

Following the certification by plaintiffs sometime in November that corrections had been made, the policy was countersigned on December 6 by the agent and delivered to them.

Defendant produced an officer of a reinsuring company whose records revealed that his company had reinsured this risk to the extent of $3,500. The secretary of defendant company testified that through a mutual arrangement with other companies, the risk was distributed and reinsured, and that the notice was given through a statement rendered at the end of each month.

Plaintiffs failed to sustain their burden. There is no proof of fraud or accident and there is no evidence of a mutual mistake of the parties, nor is there any proof that through mistake on the part of plaintiffs and fraud on the part of defendant the policy fails to express or conform to the real agreement.

" 'In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is addressed to him quite as much as to the jury—must as a whole be judged by him independently of the jury,—must satisfy his conscience as well as the jury—and cannot be rightfully submitted to the jury as the basis of any finding which he would not approve; in a word, he cannot permit the jury to do what he, as a chancellor, would not do' ": Kish v. Bakaysa, 330 Pa. 533, 535.

The case of plaintiffs does not rest upon facts that are made to appear by proofs which are clear, satisfactory in charatcer and convincing.

It is sometimes said, the evidence must be clear, precise and indubitable. "Whether the evidence meets this standard is, in an action at law, a question for the trial judge. . . . The phrase has a technical legal meaning.

That meaning is that the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue": Broida v. Travelers Insurance Company, 316 Pa. 444, 448.

From the evidence of defendant, it is clear that a binder had been placed. The issuance of a binder is a common transaction in the fire insurance business. The binder may be written, or, as in this case, it may be oral. It is an instrument used when a policy cannot be immediately issued, to evidence that the insurance coverage attaches at a specified time, and continues until the policy is issued or the risk is declined and notice thereof given: Harris v. Meyers, 160 Pa. Superior Ct. 607, 612.

In Putnam v. Home Insurance Company, 123 Mass. 324, the court held that since an oral contract of insurance may be binding, an entry of insurance made in the binding book of the agent to be temporarily in force until the risk is inspected and the company determines whether or not to accept, is sufficient to show a contract of insurance.

By the countersigning of the policy on December 6 the company elected to continue the insurance which under the binder began on October 5, 1955. The term ended October 5, 1956, and, therefore, the policy had expired when the fire occurred on October 19, 1956.

It is important to remember that this policy is the standard form required by The Insurance Company Law of May 17, 1921, P. L. 682, art. V, sec. 522, 40 PS §657, and that it contains the required provision:

"This policy shall not be valid *unless* countersigned by the duly authorized agent of this company at the agency hereinbefore mentioned."

It is also important to note that the policy does not provide that it shall not be valid "until" countersigned, nor does it provide that it shall be "valid only when" countersigned. In such cases the date of countersignature governs.

In Davis v. Home Ins. Co., 125 S. C. 381, 118 S. E. 536, the policy provided coverage from June 13, 1921, to June 13, 1922. Because it contained a provision that it should be "valid only when" countersigned and it was not so validated until June 17, 1921, the court held that a loss occurring on June 15, 1922, was covered.

So where the policy provided that it should not be valid "until" countersigned by the agent, the court held in Burner v. The American Insurance Company, 221 Mo. App. 1193, 300 S. W. 556, that a loss incurred on June 6, 1926, was covered by the policy, although it specified that it should cover only losses incurred from June 1, 1921, to June 1, 1926, where the policy was not validated until June 10, 1921. To the same effect, see National Union Fire Ins. Co. of Pittsburgh, Pa., v. California Cotton Credit Corporation, 76 F. 2d 279.

We repeat, a stipulation that a policy should not be valid "unless" countersigned by its agent is different.

In Dillon v. General Exchange Insurance Corp., 60 S. W. 2d 331 (Texas Civ. App.), the court said:

"The insurance company had a lawful right to make this policy effective from a prior date, regardless of the provision that same was not valid unless countersigned by the agent designated. This stipulation had to do with the authenticity of the policy rather than the time from which it should become effective. The policy did not provide that it was not valid *until* coun-

tersigned, but *unless* countersigned. Until might be construed as referring to time, but unless does not refer to time: Bankers Lloyds v. Montgomery (Tex. Civ. App.), 42 S. W. 2d 285; Schwartz v. Northern Life Ins. Co. (C. C. A.), 25 F. 2d 555; Anderson v. Mutual Life Ins. Co., 164 Cal. 712, 130 P. 726, Ann. Cas. 1914B, 903."

And in Union Marine & General Ins. Co. v. Holmes, 249 Ala. 294, 31 S. 2d 303, no liability was imposed for damages incurred in a collision which took place at 4:45 p.m. on February 7, 1944, where the period of coverage was from February 7, 1943, to February 7, 1944, at 12:01 a.m., with the stipulation that the policy should not be valid "unless" countersigned by the agent, which was not done until February 8.

The court declared on page 298:

"(C)onceding that the countersigning of the policy was essential to the completed execution thereof, it is clear that the delayed countersigning did not extend the period of liability, the limitation of which was stated in the face of the contract. Nor did it inject into the contract an ambiguity as to the period of the coverage. The countersignature in fact and law merely confirmed said stated limitation and gave retroactive force to the policy as of the time it was executed by the defendant company. To 'countersign' is to sign in addition to the signature of another in order to attest the authenticity of the other. Royal Exchange Assurance of London v. Almon, 202 Ala. 374, 80 So. 456, 458; Hartford Fire Ins. Co. v. King, 106 Ala. 519, 17 So. 707; New York Life Ins. Co. v. Tolbert, 10 Cir., 55 F. 2d 10; Mead v. Davidson, 3 Ad. & El. 303, 111 Eng. Reprint 428, 4 L.J.K.B. (N.S.) 193."

In McKee v. Continental Ins. Co., 191 Tenn. 413, 234 S. W. 2d 830, the stipulated policy period was from February 14, 1948, to May 14, 1949. The policy con-

tained a provision that it shall not be valid *unless* countersigned by an agent. It was countersigned on February 20, 1948, and the court held that there could be no recovery for a loss which occurred on May 17, 1949. Judge Burnett cited the language in McKee v. Continental Ins. Co., supra, and said:

"We agree fully with the statement last above quoted as likewise applicable to the state of facts here under consideration. . . .

"Courts cannot make contracts for parties. They can only enforce the contract which the parties themselves have made. In this case the parties clearly contracted that the contract period was to begin on February 14, 1948, and end on May 14, 1949."

He added:

"If the insurance company intended to write a contract for 15 months as is the contention of the plaintiff, then they could have said in the face of the policy that this policy runs 15 months from the date of the countersigning and not as said in the face of the policy that it runs from a specific date to a specific date. Clearly upon the countersigning of this policy even at a subsequent date this confirmed the contract as stated."

It was on the strength of these cases that the trial judge directed the verdict for defendant. We all agree that he could not have done otherwise.

Under the circumstances, we enter the following

### Order

Now, March 31, 1958, at 1 p.m., the motion for new trial is denied.